UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 JAN 24  PM 4: 44

LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| SENECA RESOURCES CORPORATION | * | CIVIL ACTION |
| VERSUS | * | NO. 05-250 |
| SUPERIOR DIVING COMPANY, INC. AND USI GULF COAST, INC. | * | SECTION "L"(5) |

## ORDER & REASONS

Pending before the Court is Defendants Superior Diving Company, Inc. and Osprey Underwriting Agency, Inc.'s Joint Motion for Partial Summary Judgment (Rec. Doc. 19).  For the following reasons, the motion is GRANTED.

## I.    BACKGROUND

On May 10, 1999, Seneca Resources Corporation ("Seneca") and Superior Diving Company, Inc. ("Superior") executed a Master Service Agreement ("MSA").  As of December 1, 2000, Seneca was the owner of the working interest in the oil, natural gas, and other minerals situated in the High Island Area, Block A-345 ("H.I. A-345").  The MSA, which governs Seneca's purchase of material and services from Superior, was drafted by Seneca.  Furthermore, the MSA set forth the procedures through which Seneca could place Orders to Superior for materials and services.  In addition, the MSA stipulated that Superior would provide certain warranties to Seneca guaranteeing that its materials and services were in compliance with the MSA.

On December 12, 2003, Seneca purchased a "smart buoy" from Superior.  The "smart buoy" was utilized in connection with Seneca's drilling operations.  During January Process

___ Fee
___ Process
_X_ Dktd
___ CtRmDep
___ Doc. No.

Superior was notified by a third-party that there was a problem with Seneca's "smart buoy." Accordingly, Superior contacted Seneca by telephone to discuss the "smart buoy." In the course of this telephone conversation, Superior informed Seneca that it would send a vessel to inspect the buoy.

On January 29, 2004, Superior arrived in Seneca's H.I. A-345 and performed work on Seneca's "smart buoy." During the course of Superior's work, Seneca alleges that the anchor or anchor chain/wire of Superior's Vessel, the M/V GULF DIVER III, came in contact with Seneca's well head. It is further alleged that this contact caused a large amount of gas to be released at high pressures which damaged the connected piping spools between the pipeline and the wellhead and allowed seawater to enter the pipeline. In addition, the force of the gas allegedly knocked the guard-cover for the hydraulic control umbilical off the wellhead. Furthermore, a small amount of condensate was also released. As a result of the contact, Seneca alleges that it suffered approximately $749,246.23 in damages for the repair and replacement of the wellhead and $2,300,000 for loss of production at the well.

On February 19, 2004, Superior generated Invoice No. 1986-04. This invoice reflected that Seneca owed Superior $13,856.69 for the work performed on Seneca's "smart buoy."

On January 28, 2005, Seneca filed suit against Superior and USI Gulf Coast Inc. ("USI"), Superior's producing agent for its insurance coverage, alleging that Superior and USI were liable to it for the damages it incurred as a result of Superior's work on its "smart buoy." On February 22, 2005, Seneca amended its complaint to add Osprey Underwriting Agency, Ltd. ("Osprey"), Superior's insurer, as a defendant and to eliminate any reference to USI.

**II. PRESENT MOTION**

In their present motion, Superior and Osprey assert that the work performed by Superior

on January 29th, was governed by the MSA.  Specifically, Superior and Osprey contend that

Superior's work was governed by the warranty provisions of the MSA and/or constitutes an

Order under the MSA.  On the other hand, Seneca argues that the work was neither covered by

the warranty provisions of the MSA nor an Order under the MSA.

The resolution of this issue is important because section 20(b) of the MSA precludes the

recovery of consequential or indirect damages arising from the breach of any obligation under the

MSA or any Order, regardless of the fault of any party.  Accordingly, if the work is governed by

the MSA, it is Superior and Osprey's contention that Seneca's $2,300,000 in loss production

damages are unrecoverable under the MSA.

## III.  LAW AND ANALYSIS

Summary judgment is appropriate if the record, as a whole, shows that there is no genuine

issue of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  To overcome summary judgment,

"the nonmoving party must come forward with specific facts showing that there is a genuine

issue for trial." *Matshusita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The Court must view the evidence in the light most favorable to the nonmovant and draw all

reasonable inferences in the nonmovant's favor. *King v. Chide*, 974 F.2d 653, 656 (5th Cir.

1992).

In the present case, all the parties agree that the MSA was in effect on January 29, 2004.

The parties, however, disagree as to whether the work performed on January 29th is governed by

the MSA.  Specifically, the dispute is to whether the work is governed by the warranty and/or

order provisions of the MSA.

### A. Warranty Provisions

Section 6 of the MSA governs warranties, quality standards, and inspections. Section 6(a)(I) provides that Superior warrants "that all material and services shall be free from defects in design, workmanship, quality, and materials." Section 6(c) provides: "If [Superior] is notified of any defects and fails to promptly cure such defects, Company shall have the right to cure or to have such defects cured at [Superior's] cost and expenses, and [Superior] shall promptly reimburse [Seneca] for such costs and expenses." These provisions stipulate that once Superior is notified, through any source, that its materials, such as a "smart buoy," are defective, Superior must promptly cure the defects. Only after Superior fails to promptly cure the defects does Seneca have the right to cure or to have such defects cured at Superior's cost and expenses.

In the present case, Superior was notified of a defect in the "smart buoy" by a third party. This notice, by itself, was enough to trigger Superior's duty under section 6(c) to promptly cure the defect. Superior, however, went further and called Seneca to confirm the existence and discuss the extent of a defect in the "smart buoy." At this point, Superior was certainly aware of a defect in the "smart buoy." As such, Superior had the option to promptly cure the defect or do nothing and eventually reimburse Seneca for its costs and expenses. Superior chose to promptly cure the defect itself. Accordingly, the work performed by Superior on January 29, 2004, was governed by the MSA.

Seneca argues that Superior's conduct indicates that Superior did not believe the work performed on January 29th was governed by the MSA. First, Seneca points out that Superior generated an invoice for the work. According to Seneca, if Superior believed that the MSA was in effect, Superior would not have generated an invoice because Superior would have known that

it, not Seneca, was financially responsible for the repair work.

Seneca's argument, however, is unsuccessful in light of section 4(d) of the MSA.  Section 4(d) provides that the MSA may not be amended, modified, or waived unless such amendment, modification, or waiver is (1) in writing; (2) signed by both Superior and Seneca; and (3) expressly refers to the provisions, terms, or conditions which are affected.  Since the invoice did not comply with the requirements of section 4(d), it cannot serve as a modification, amendment, or waiver of the MSA.

Second, Seneca argues that Superior did not obtain the necessary vendor and supplier warranties mandated by section 6(b).  Section 6(b) provides: "In addition to [Superior's] warranties, [Superior] shall obtain, to the maximum extent reasonably possible, assignable vendor and supplier warranties that materials and equipment delivered are in compliance with the requirements of the Order."  Unfortunately, since Seneca only briefly addressed this issue in its opposition brief and Superior and Osprey did not address this issue at all, the Court does not have a basis to determine the accuracy of Seneca's factual allegations.  Despite this lack of information, the Court finds that Superior's alleged failure to comply with the requirements of section 6(b) does not negate its obligations under section 6(c) or somehow render the January 29th work beyond the MSA's coverage.  Therefore, the Court finds that the January 29th work was covered under the MSA's warranty provisions.

**B. Order Provisions**

Section 4 of the MSA governs Orders.  It provides: "If and when [Seneca] desires [Superior] to furnish any material or to perform any services, [Seneca] may issue any of the following (an 'Order'): . . . (iii) an oral order for material or services."  "Services," which is

5

defined under section 2, include:

> any performance of work or services or other business activity (including providing all necessary equipment) of [Superior] which contemplates or requires that [Superior] enter upon or utilize any Premises of [Seneca], or which requires [Superior] install, recondition, maintain, or repair for the benefit of [Seneca] any property owned, leased, chartered, or operated, in whole or in part, by [Seneca].

Moreover, under the MSA, "services" is to be defined broadly.

In the present case, Seneca and Superior had a telephone conversation wherein Seneca informed Superior of a defect in its "smart buoy" and Superior informed Seneca that it would send a vessel to inspect the buoy. The Court finds that this telephone conversation did constitute an Order because there was an oral request by Seneca that Superior perform work on property owned by Seneca requiring Superior to enter on Seneca's premises.

Seneca contends that its telephone conversation with Superior did not constitute an Order because Seneca never explicitly requested Superior to perform work, but instead simply notified Superior of a defect in the "smart buoy." The Court finds that this interpretation is pure semantics. Seneca told Superior that the "smart buoy" was defective. Superior informed Seneca that it would send a vessel to inspect the "smart buoy." The Court finds that Seneca's informing Superior of a defect and agreeing to allow Superior to enter onto its premises to inspect the defect is the functional equivalent of simply telling Superior to enter onto its premises.

Lastly, Seneca argues that a letter between Opsrey's counsel and Superior's counsel indicated that Superior never considered the January 29th work governed by the MSA. Letters, however, are not admissible as summary judgment evidence. *Lovable Co. v. Honeywell, Inc.*, 431 F.2d 668, 674 (5th Cir. 1970). Therefore, this letter will be disregarded.

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants Superior Diving Company, Inc. and Osprey Underwriting Agency, Inc.'s Joint Motion for Partial Summary Judgment.


New Orleans, Louisiana, this __24th__ day of __January__, 2006.

UNITED STATES DISTRICT JUDGE