UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SENECA RESOURCES CORPORATION | * | CIVIL ACTION |
| VERSUS | * | NO. 05-250 |
| SUPERIOR DIVING COMPANY, INC. AND USI GULF COAST, INC. | * | SECTION "L"(5) |

## ORDER & REASONS

Pending before the Court are Defendants Superior Diving Company, Inc., Osprey Underwriting Agency, Inc., and USI Gulf Coast, Inc.'s Joint Motion for Partial Summary Judgment (Rec. Doc. 50) and National Union Fire Insurance Company of Pittsburgh, Pa.'s Motion for Partial Summary Judgment to Dismiss Plaintiff's Claim for Breach of Settlement Agreement (Rec. Doc. 117). For the following reasons, the motions are GRANTED.

**I.     BACKGROUND**

On May 10, 1999, Seneca Resources Corporation ("Seneca") and Superior Diving Company, Inc. ("Superior") executed a Master Service Agreement ("MSA"). As of December 1, 2000, Seneca was the owner of the working interest in the oil, natural gas, and other minerals situated in the High Island Area, Block A-345 ("H.I. A-345"). The MSA, which governs Seneca's purchase of material and services from Superior, was drafted by Seneca and set forth the procedures through which Seneca could place Orders to Superior for materials and services.

On December 12, 2003, Seneca purchased a "smart buoy" from Superior. The "smart buoy" was utilized in connection with Seneca's drilling operations. During January 2004, Superior was notified by a third-party that there was a problem with Seneca's "smart buoy." Accordingly, Superior contacted Seneca by telephone to discuss the "smart buoy." In the course

1

of this telephone conversation, Superior informed Seneca that it would send a vessel to inspect the buoy.

On January 29, 2004, Superior arrived in Seneca's H.I. A-345 and performed work on Seneca's "smart buoy." During the course of Superior's work, Seneca alleges that the anchor or anchor chain/wire of Superior's Vessel, the M/V GULF DIVER III, came in contact with Seneca's well head. It is further alleged that this contact caused a large amount of gas to be released at high pressures which damaged the connected piping spools between the pipeline and the wellhead and allowed seawater to enter the pipeline. In addition, the force of the gas allegedly knocked the guard-cover for the hydraulic control umbilical off the wellhead. Furthermore, a small amount of condensate was also released. This incident caused severe property damage to Seneca.

Soon after the incident, Seneca requested bids to repair its wellhead and related equipment. On February 3, 2004, Barry McMahon, Seneca's senior vice president, sent a letter to Louis E. Schaeffer, Superior's president, demanding that Superior "correct the problem it has caused and restore the well to production." Furthermore, in the letter, Mr. McMahon notified Mr. Schaeffer that Superior would be allowed "to bid on the work required to restore the well to production." After submitting the lowest bid, Superior was awarded a contract to perform most of the repair work. On March 8, 2004, following completion of its repair work, Superior generated Invoice No. 1994-04 and submitted it to Seneca for payment.

On March 24, 2004, Donald P. Butler, Seneca's senior counsel, sent another letter to Mr. Schaeffer acknowledging that the damages incurred on January 29, 2004 had been repaired and demanding that Superior pay for all of the repair costs. The repair costs, including the costs

submitted by Superior and other third parties contractors, totaled $749,246.43, with the vast majority of the costs attributable to Superior's work.

On April 7, 2004, R. Joshua Koch, Jr., Superior's counsel, sent a letter to Mr. Butler confirming the details of an April 6, 2004 telephone call between the two. In the letter, Mr. Koch confirmed that Seneca did "not intend to submit a claim for loss of profit or loss of production associated with the damage to Seneca's subsea wellhead and flowline at its High Island A345 location" and that Seneca's "agreement to waive and forego this potential elements of its claim is contingent on an acceptable resolution of its property damage which has been submitted to Superior's insurers for consideration." In an April 14, 2004 reply letter, Mr. Butler indicated to Mr. Koch his agreement with the provisions in April 7th letter.

On April 21, 2004, Burnett J. Tappel III, an employee of USI Gulf Coast, Inc., which was Superior's producing agent for its insurance coverage and an agent for Superior's liability insurer, Osprey Underwriting Agency, Ltd. ("Osprey"), sent a letter to Mr. Butler responding to Seneca's claim for reimbursement, including Superior's invoices in the approximate amount of $515,000. Mr. Tappel indicated that Seneca's loss would be paid by Superior's insurers within a week to ten days. Mr. Tappel further indicated that Superior was "experiencing a big cash flow problem" and, as such, was requesting "Seneca to advance payment for its outstanding invoices." According to Mr. Tappel, if Seneca agreed to this request, Superior's insurers agreed to reimburse Seneca for all amounts advanced in payment of Superior's invoices.

On April 22, 2004, Mr. Tappel emailed Mr. Butler clarifying his letter from the previous day. In the email, Mr. Tappel stated that "the $515,000 reflects the amount of Superior's invoices only." It further stated that "[t]he total amount of the claim is in excess of $700,000 and

includes third party charges incurred directly by Seneca who will be reimbursed directly by underwriters for these charges."

On April 23, 2004, Mr. Butler sent another letter to Mr. Koch, which was eventually agreed to by Mr. Schaeffer. The letter set forth the following:

> In reliance on the letter dated April 21, 2004 and on an e-mail dated April 2[2], 2004 clarifying the letter, all from Burnett J. Tappel III to me, Seneca would like to make a wire payment to [Superior] of $483,201.61 on Invoice 1994-04 dated March 8, 2004 in the amount of $483,201.61, if we can agree on the following:
>
>     1.    Seneca will be reimbursed from the $515,000 for the $483,201.63 it will pay to Superior.
>
>     2.    Seneca reserves the right to dispute Invoice 1985-04 for $98,306.41. Seneca requested [Superior] to do this evaluation work at Superior's expense.
>
>     3.    Once the property claim has been settled, Seneca does not intend to make a claim for lost production, etc., but Seneca reserves a claim for any regulatory fine, which we estimate will not exceed $200,000.

After the April 23rd letter was mailed and received, Seneca wired the $483,201.61 to Superior. Despite Seneca's advancement of this money, neither Superior, Osprey, or USI have reimbursed Seneca for any of the damages incurred as a result of the January 29th incident.

On January 28, 2005, Seneca filed suit against Superior and USI. On February 22, 2005, Seneca amended its complaint to substitute Osprey in place of USI. After the substitution, Osprey filed a third-party complaint against USI.

In its complaint, Seneca asserted that the correspondence beginning with the February 3rd letter and concluding with the April 23rd letter constituted a settlement agreement under article 3071 of the Louisiana Civil Code. According to Seneca, the Defendants agreed to pay Seneca's property damage claim or reimburse Seneca for the entirety of repair work

4

performed—the work done by Superior and all other third-party contractors. In return, Seneca agreed to forego its loss of production claim.

## II.     PRESENT MOTION

In their present motion, Superior, Osprey, and USI contend that the parties never entered into any settlement agreement and, as such, they are entitled to summary judgment on this theory of liability. Additionally, National Union Fire Insurance Company of Pittsburgh, Pa. filed its own motion for summary judgment incorporating by reference the entirety of Superior, Osprey, and USI's motion. In opposition, Seneca contends that the correspondence between the parties does indicate that a settlement agreement had been reached.

## III.    LAW AND ANALYSIS

Summary judgment is appropriate if the record, as a whole, shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To overcome summary judgment, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matshusita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *King v. Chide*, 974 F.2d 653, 656 (5th Cir. 1992).

"A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing." La. Civ. Code art. 3071. Therefore, a transaction or

compromise is the equivalent of a settlement agreement. *Townsend v. Square*, 94-758 (La. App. 4 Cir. 1994), 643 So. 2d 787, 788. Unless recited in open court, a transaction or compromise must be in writing. La. Civ. Code art. 3071.

There are two essential elements to any transaction or compromise: (1) mutual intention of preventing or putting an end to litigation; and (2) reciprocal concessions of the parties in the adjustment of their differences. *Rivett v. State Farm Fire & Cas. Co.*, 508 So. 2d 1356, 1359 (La. 1987). Even though a compromise or transaction may consist of multiple writings, those writings must meet "the high standards required to establish the confection of a settlement," including "the requirement that the acceptance and acquiescence therein of both parties be clearly and unequivocally expressed." *Townsend*, 643 So. 2d at 790.

In the present case, Seneca contends that the correspondence between the parties constitutes either an agreement by the Defendants to reimburse Seneca for the entirety of its repair costs or a settlement agreement as to Seneca's property damage claims. Seneca's contention is incorrect.

The correspondence, culminating in the April 23rd letter, does not in any way obligate the Defendants to pay for the entirety of the repair work or form a settlement agreement. In the April 23rd letter, Seneca agreed to wire $483,201.61 to Superior if the parties could agree on three things: (1) Seneca would be reimbursed the $483,201.61; (2) Seneca would be able to reserve its right to dispute another invoice submitted by Superior; and (3) Seneca would forego its loss of production claim, but reserve a claim for regulatory fines once the property claim was settled. Nowhere in any of the correspondence do the Defendants agree to reimburse Seneca for the entirety of the repair work. Instead, the Defendants only agreed to reimburse Seneca for the

$483,201.61 that it would forward to Superior.  Seneca clearly stipulated to this in its April 23rd letter.  The only place where there may be some ambiguity as to what the Defendants were agreeing to reimburse is the April 21st letter from Mr. Tappel to Mr. Butler.  This ambiguity, however, was clarified by the next day's email, which was relied upon by Seneca in its April 23rd letter.  As such, Seneca has no basis for arguing that the Defendants agreed to reimburse Seneca for the entirety of the repair work performed.

Next, there is the issue of whether the parties settled Seneca's property damage claim.  This issue is only mentioned twice in the correspondence.  First, in the April 7th letter from Mr. Koch to Mr. Butler, which was agreed to by Mr. Butler in his April 14th letter, Superior confirmed that Seneca would agree to waive its loss of production claim if the parties reached an acceptable resolution to Seneca's property claim.  Second, in the April 23rd letter from Mr. Butler to Mr. Koch, Seneca stipulated that it would wire Superior $483,201.61 upon the parties' agreement that "[o]nce the property claim has been settled, Seneca does not intend to make a claim for lost production, etc., but Seneca reserves a claim for any regulatory fine, which we estimate will not exceed $200,000."  All that these statements indicate is that Seneca will waive its loss of production claim if the parties resolve Seneca's property claim.  There is no mutual intention of preventing or putting an end to litigation.  As such, these statements cannot be construed as a settlement of Seneca's property damage claim.

### IV.     CONCLUSION

For the foregoing reasons, Defendants Superior Diving Company, Inc., Osprey Underwriting Agency, Inc., and USI Gulf Coast, Inc.'s Joint Motion for Partial Summary Judgment is GRANTED.  Furthermore, National Union Fire Insurance Compnay of Pittsburgh,

Pa.'s Motion for Partial Summary Judgment is GRANTED.

New Orleans, Louisiana, this 24th day of April , 2006.

_____
UNITED STATES DISTRICT JUDGE